DOMENGEAUX, Judge.
This appeal concerns itself with a vehicular accident which occurred on January 16, 1969 at approximately 5:45 o’clock P. M. after dark, at the intersection of Indest and Henry Streets in the City of New Iberia. Plaintiff-appellee Naulis J. Brous-sard, while driving his Comet automobile on Indest Street, was struck from the rear by a Ford automobile belonging to the Louisiana Department of Public Safety, Division of State Police, which was being driven by its employee, Trooper Dale McAnally. Claiming negligence on the part of Trooper McAnally, Mr. Broussard filed suit against Travelers Indemnity Company, the liability insurer of the Ford automobile.
Mr. Broussard, who was 52 years of age at the time of the accident, claims damages for personal injuries to the cervical, thoracic and lumbar regions of the back, in addition to injuries to the left knee, all of which caused him pain, suffering and disability in addition to the incurring of medical expenses. He also seeks an award for property damage to his automobile. There is no claim for lost wages.
The case was tried before a jury commencing on January 10, 1971, and resulted in a verdict in favor of plaintiff in the amount of $23,733.00. Since the liability insurance policy issued by the defendant Travelers was limited to the sum of $20,-000.00, formal judgment was rendered by the district court in that amount.
Travelers has appealed suspensively to this court. Liability is not at issue, and we are only concerned with the alleged exces-siveness of the jury award in light of the evidence presented.
Called to testify on behalf of the plaintiff were Drs. Roy L. Landry and Thomas C. Bush, general practitioners, and Dr. Blaise Salitich, an orthopedic surgeon. Dr. Richard W. Levy, a neurosurgeon and Dr. Harry J. Moresi, Jr., a radiologist, testified upon call by defendant.
The collision was relatively minor, and after the accident was investigated by the New Iberia City Police, the plaintiff drove his automobile to his home. He then went to the emergency room at the Dauterive Hospital, and in the absence of his family physician, Dr. Roy L. Landry, he was seen by another physician. That physician, thought to be a Dr. Musso, did not testify. Plaintiff returned to the hospital the next day, January 17, 1969, and was examined by Dr. Landry. Dr. Landry saw plaintiff again on January 22, 1969 and hospitalized him from that date through February 1, 1969. Dr. Landry saw plaintiff again on March 12, 1970, May 27, 1970 and finally on January 9, 1971, shortly before the trial of this case. Plaintiff was also examined and followed up by Dr. Thomas C. Bush *711 who saw him approximately nine times from May 22 to October 1, 1969. Additionally he was sent by his attorney to be examined and treated by Dr. Salitich in New Orleans, who first saw him on February 24, 1969 and who treated him until the time of trial.
X-rays of the back and left knee, the areas complained of, were taken the day after the accident (January 17, 1969) by order of Dr. Landry. Repeat x-rays were made on January 22, 1969. Further x-rays were made on February 24, 1969, February 4, 1970 and January 7, 1971.
Dr. Roy L. Landry, plaintiff’s family physician, testified that when he first saw plaintiff the day after the accident there were complaints of pain in the left knee, in the neck, and in the back. His examination revealed an abrasion and contusion of the left knee, however there was no fluid in the joint, the range of motion of the joint was not limited and the knee was clinically stable. He found tenderness in the trapezius muscle and tenderness upon manipulation of the neck. There were no other findings at that time. There was no spasm. X-ray of the left knee revealed a narrowing of the interspace, which Dr. Landry attributed to osteoarthritis, caused by the aging process, and not connected with the accident. X-ray showed slight narrowing of the C-2 and C-3 interspace. Although he did not find spasm himself, the doctor indicated that x-ray of the cervical vertebrae indicated some spasm. He prescribed medication. He next saw Mr. Broussard on January 22, 1969 at which time he complained of pain in his back, legs, arms and of being nervous. Because of plaintiff’s complaints, the doctor hospitalized him from January 22 to February 1, 1969. The doctor found some marked spasm of the paraspinous muscles in the mid and lower lumbar area. X-rays taken during this hospital confinement revealed a slight narrowing of the lumbar disc space and spurring in the thoracic and lumbar areas consistent with osteoarthritis, caused by the .aging process, but- not associated with the accident. He ruled out a ruptured disc and felt that none of the plaintiff’s complaints were justified except as related to the lower back. The plaintiff apparently suffered from epilepsy and nervousness predating the accident, and had been a patient at a Veterans’ Hospital, and the doctor continued him on medication which had been prescribed from that hospital. ' The plaintiff showed marked improvement during his hospitalization, and after his discharge, he was continued on the veteran hospital’s medication in addition to muscle relaxants and analgesics. On February 26, 1969, plaintiff called Dr. Landry and informed him that he went to consult Dr. Salitich in New Orleans. Dr. Landry saw plaintiff on March 12, 1970. He was complaining of pain in the left knee, and upon examination, Dr. Landry found no pathology. On May 27, 1970 plaintiff went to Dr. Landry’s office and complained that he had had difficulty walking a few days previously, however on this date, he was walking well and was having no difficulty. On that date, the doctor, upon request of plaintiff, filled out a Veterans Administration form concerning plaintiff’s epilepsy. On January 9, 1971 plaintiff came again to Dr. Landry’s office and complained of difficulty sleeping, and discomfort with a neck brace and back corset which Dr. Salitich had prescribed. He complained of backache from the waist up. Dr. Landry examined plaintiff and found no restriction of motion, no muscle spasm, and only subjective complaints of tenderness over the spinous processes of the thoracic and lumbar spine which the doctor indicated were not consistent with his findings. He did find some slight muscle spasm in the lumbar area upon flexion of the knees. Examination of the left knee showed no evidence of interarticular fluid or edema and the joint appeared to be clinically stable with a full range of motion. Dr. Landry’s impression at this time was to the effect that there was no organic basis for plaintiff’s complaints except for mild intercostal neuritis and myositis of the sixth intercostal space *712 which was not attributed to the accident. Additionally Dr. Landry indicated that the plaintiff possesses hypochondriacal tendencies.
Plaintiff was seen by Dr. Thomas C. Bush nine times, beginning May 22 and ending October 1, 1969. The doctor did not treat plaintiff during this period inasmuch as it was his understanding that the plaintiff wished him, as a local physician, to more or less follow him along in case he would need any medication for pain in the absence of Dr. Salitich, who, by this time, as aforesaid, had begun treating plaintiff. Dr. Bush’s examination revealed muscle spasm and tenderness in the cervical area and also in the low back, of a moderate nature. As of his last examination, Dr. Bush indicated that plaintiff’s neck condition was improving and his low back condition was about the same. Dr. Bush makes no mention of any complaint made by plaintiff referable to his left knee. The only complaints mentioned by the doctor as having come from the plaintiff were those of the neck and back.
The third doctor to testify on behalf of plaintiff was Dr. Blaise Salitich. He first examined the plaintiff on February 24, 1969 and saw him some 13 times through the trial date of January 10, 1971. During this period he treated plaintiff conservatively, prescribed a neck brace, a low back corset and a left knee brace. He also caused plaintiff to take physiotherapy treatments. Dr. Salitich concluded that plaintiff, as a result of the accident, received a whip lash type injury to the neck, with a possible stretch-type cervical nerve root injury, which he said had permanent implications. He was the only doctor who diagnosed a compression fracture of the fifth and sixth thoracic vertebrae. Concerning plaintiff’s left knee, Dr. Salitich reported as of April, 1969, some three months after the accident, that the knee had no substantial clinical findings. However, on November 5, 1969, Dr. Salitich prescribed a knee brace because the knee at that time showed “significant findings”.
Dr. Richard W. Levy testified on behalf of defendant and stated that he examined the plaintiff on February 4, 1970 and also reviewed x-rays. He found a 50-percent restriction of motion when plaintiff moved his head from side to side, a slight restriction when he attempted to straighten up after bending over and in side to side bending, and that plaintiff’s left thigh was one inch smaller than the right. Dr. Levy found a normal curve of the neck with no spasm. He was able to bend his neck completely forward and back again and his head did not tilt. There was no muscle wasting, all reflex tests were normal and the straight leg bending test was normal bilaterally. All tests of the arms were negative which indicated no injury to the cervical nerves. Plaintiff complained of numbness on the left side of his body but this followed no medical pattern and there was no medical explanation for it. Dr. Levy found a normal curve in the back, the hip bones were equal in height and there was no muscle spasm.
X-rays ordered by Dr. Levy revealed moderate degenerative arthritis throughout the plaintiff’s spine to the same extent as the x-rays taken immediately after the accident, approximately one year before Dr. Levy’s examination. The doctor stated that these arthritic or degenerative changes having appeared so soon after the accident on x-rays could not be attributed to the accident.
Dr. Harry J. Moresi, Jr., the radiologist, reviewed all x-rays taken. In the cervical area there was a narrowing of the second and third disc spaces. Dr. Moresi attributed this finding to plaintiff’s aging process. There was no subluxation or displacement of the vertebrae bodies which might have caused nerve root pressure. Arthritic spurring showed up in the x-rays but Dr. Moresi, in conformity with the other doctors, testified that the spurring, having been seen so soon after the accident on x-rays, existed prior to the accident. In the thoracic area the spurring was consistent with Mr. Broussard’s aging process. He *713 found no evidence of fracture. Concerning plaintiff’s left knee, the narrowing of the knee joint was attributed to plaintiff’s aging process and not to the accident.
That plaintiff was injured in the accident cannot be denied. It is difficult however to reconcile Dr. Salitich’s findings and conclusions with those of the other physicians who testified in this case. It is evident that the jury was impressed with Dr. Salitich’s testimony. We are not. A review of his testimony indicates over-emphasis and exaggeration. In the history which he reports having taken from the plaintiff upon his initial examination, he states that plaintiff complained of light sensitivity and visual disturbances the morning after the accident and also of severe headaches. Dr. Landry examined plaintiff the morning after the accident and reported no such symptoms, neither do the hospital records indicate such complaints. The plaintiff himself did not so testify. Dr. Salitich reported in April, 1969, three months after the accident, that plaintiff’s left knee showed no substantial clinical findings but in November, 1969, he prescribed a knee brace because it then showed “significant findings”. The other doctors found plaintiff’s knee clinically stable and consistent with his aging process. Dr. Salitich was the only doctor who opined that plaintiff sustained a fracture in the thoracic vertebrae. His testimony is replete with numerous medical “possibilities” which, if viewed in their proper format, are designed to leave an impression of reasonable medical certainty. Overall, the testimony of Dr. Salitich reads more like the advocacy of a cause than the report of an impartial medical expert. This is not the first case appealed to this court in which Dr. Salitich appeared as a witness. We know, from previous exposures, that he has a propensity for overstatement when it comes to evaluation of personal injuries.
We find that the plaintiff, as a result of the accident, has proved by a preponderance of the evidence that he received a whip-lash type muscular injury to the neck, some moderate injury to the low back and an abrasion and contusion of the left knee. It is our opinion that the jury committed reversible error in returning the size award that it did. Plaintiff proved special damages of $4,076.80 which includes vehicular damages and medical expenses. This amount also includes $2,139.00 for physiotherapy which had been ordered by Dr. Salitich.
Based on our conclusions we believe that an award of $6,500.00 to plaintiff for his pain, suffering and temporary disability is adequate.
In view of our reduction of the jury’s award in this case, we do not deem it necessary to consider the other issues raised by appellant.
For the foregoing reasons the judgment of the trial court is amended so as to reduce the award to plaintiff to $10,576.80, and as thus amended is affirmed. Costs of this appeal are assessed to plaintiff-appel-lee.
Affirmed as amended.